IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF five Apple iPhones and one Samsung cellular phone seized by law enforcement during an arrest on April 4, 2023. | Case No. 2:23-mj-00089 |

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A SEARCH WARRANT

I, Jennifer L. King, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the extraction and examination of electronically stored information from certain electronic communication devices seized by police on April 4, 2023 during the arrest of ALEJANDRO GALLEGOS, also known as "ROOSTER." The devices are more particularly described herein and in Attachment A and include six cellular telephones (SUBJECT DEVICES). The electronically stored information sought under this warrant is more particularly described herein and in Attachment B. The SUBJECT DEVICES are currently located at the Federal Bureau of Investigation (FBI) Charleston Resident Agency, 113 Virginia Street East, Charleston, West Virginia.

2. I am a Special Agent employed by the United States Department of Justice, the Federal Bureau of Investigation (hereinafter "FBI"), and as such I am a "federal law enforcement officer" within the meaning of Fed. R. Crim. P. 41(a)(2)(C) and authorized to apply for federal search warrants. I have been employed as a Special Agent of the FBI since

February 2008, and I am currently assigned to work drug investigations in the Charleston, West Virginia Resident Agency of the Pittsburgh Division. Previously, I was assigned to the Long Island Resident Agency of the New York Division and served as a member of the Long Island Gang Task Force ("LIGTF"). As a member of the LIGTF, I investigated drug trafficking, money laundering, gangs, violent crimes, and other offenses. I have personally participated in over 100 arrests and search warrants and have been an Affiant on numerous federal Title III affidavits. Prior to joining the FBI, I was employed as a police officer with the Clarksville Police Department located in Clarksville, Tennessee and as a chemist with the Drug Enforcement Administration ("DEA") for approximately one year.

3. During my tenure with the FBI, I have participated in numerous drug investigations during the course of which I have (a) conducted physical and wire surveillance; (b) executed search warrants at locations where drugs, drug proceeds, and records of drugs have been found; (c) reviewed and analyzed numerous recorded conversations and records of drug traffickers; (d) debriefed cooperating drug traffickers; (e) monitored wiretapped conversations of drug traffickers and reviewed line sheets prepared by wiretap monitors; and (f) conducted surveillance of individuals engaged in drug trafficking. Through my training, education, and experience, I have become familiar with (a) the manner by which illegal drugs are imported and distributed; (b) the method of payment for such drugs; and (c) the efforts of persons involved in such activity to avoid detection by law enforcement.

4. In the course of my current duties, I am participating in an investigation relating to a drug trafficking organization (hereinafter "DTO") whose members include ALEJANDRO GALLEGOS, also known as "ROOSTER" (hereinafter "GALLEGOS"), ILDIBERTO GONZALEZ, JR. (hereinafter "GONZALEZ"), other persons known, and other persons as yet

2

unknown (collectively the "SUBJECTS" or "SUBJECT INDIVIDUALS"), in violation of 21 U.S.C. §§ 841(a)(1), 843(b), and 846, that is, distribution of controlled substances; use of a communication facility to facilitate drug trafficking; and conspiracy to distribute controlled substances (hereinafter the "TARGET OFFENSES").

5. The facts in this Affidavit come from my personal observations, my training and experience, and information obtained from other agents, law enforcement officers, and witnesses. Summaries of recorded conversations are based on draft transcripts of those conversations. This Affidavit is intended to show that there is sufficient probable cause for the requested warrant and does not set forth all my knowledge about this investigation.

### IDENTIFICATION OF THE DEVICE TO BE EXAMINED

6. The SUBJECT DEVICES are 1) Black Samsung, SM-A037U (Galaxy A035), Serial Number R9WT807P7HT, IMEI 354327820241502; 2) Silver Apple A2484 iPhone, IMEI 350419534609902 from SIM card tray; 3) Silver Apple A1688 iPhone in black case, IMEI 356676083307287 from SIM card tray; 4) Black Apple A1660 iPhone in clear case, IMEI 359166074047743 from SIM card tray, Serial Number F4HSF7H1HG71; 5) Silver Apple A2484 iPhone in clear case, IMEI 356370166947041 from SIM card tray; 6) Black Apple A1660 iPhone in clear case, IMEI 359461082334575 from SIM card tray.

7. The SUBJECT DEVICES are currently located at 113 Virginia Street East, Charleston, West Virginia, 25301. The applied-for warrant would authorize the forensic examination of the SUBJECT DEVICES for the purpose of identifying electronically stored data particularly described in Attachment B.

## **PROBABLE CAUSE**

8. In February 2023, the FBI developed a confidential informant (hereinafter "CI"). The CI has proven to be credible and reliable based on corroborating information, such as recorded telephone calls between the CI and GALLEGOS, information from a related Title III investigation, surveillance conducted by officers, and other information gathered by officers. The CI is cooperating with law enforcement in hopes of receiving leniency in future federal charges. The CI has a known conviction for "Possession with Intent Sale/Delivery of a Controlled Substance".

9. The CI advised officers that his/her drug supplier is "ROOSTER", later identified after a traffic stop on April 4, 2023, to be GALLEGOS. The CI does not know GALLEGOS' legal name, but for the purposes of this affidavit "ROOSTER" will be referred as GALLEGOS. GALLEGOS resides in California. The CI contacts GALLEGOS on a cellular telephone. Over the last year, GALLEGOS has used semi-trucks to transport controlled substances from California to the CI in Bluefield, West Virginia and to other customers in locations throughout the United States. The CI advised officers that a semi-truck comes to Bluefield, West Virginia to resupply the CI approximately once a month. The CI advised that the first and second time the semi-truck came to resupply the CI, the CI obtained approximately five kilograms of cocaine and a kilogram of fentanyl each time. After the first two months, the CI advised that s/he began getting 50 pounds of methamphetamine each time the semi-truck arrived, which later increased to 100 pounds per trip and then eventually 200 pounds per trip. The last two times the CI was resupplied, the CI obtained 200 pounds of methamphetamine on each occasion. GALLEGOS

4

communicated with the CI through a cellular telephone and told the CI where and when to meet the semi-truck to obtain his/her supply of controlled substances.

10. On March 1, 2023, the CI recorded his/her calls with GALLEGOS. Based on my training, experience, and the investigation thus far, I believe GALLEGOS asked the CI how much cocaine he/she wanted ("How many girls do you want to prepare for you?"). The CI stated that he/she wanted the same amount as usual ("Shit bro. Like we usually do."). GALLEGOS asked if the CI wanted 10 kilograms of cocaine ("Two hands?") and the CI advised yes ("Yeah, that's cool."). GALLEGOS told the CI to have the money he/she owed to GALLEGOS ready when the drivers of the truck arrived in Bluefield, West Virginia between 10:30 and 11:00 PM ("Get on that ball. These guys told me they will be there around 10:30-11:00 okay, just so you know so you are ready.") GALLEGOS and the CI continued to discuss the money that the CI was supposed to provide to the drivers of the truck. GALLEGOS asked if the CI just wanted to pay his outstanding debt for controlled substances that the CI received from GALLEGOS in the past ("You just want to take care of the old tab?") and the CI confirmed that he/she just wanted to pay the money s/he owed and s/he would pay for the cocaine later ("Yeah, let's just take care of this one, this tab and then the next one.").

11. On March 18, 2023, the CI and GALLEGOS spoke on the telephone and GALLEGOS coordinated a delivery of controlled substances to the CI in Bluefield, West Virginia that was to take place on March 18, 2023. The CI was directed by GALLEGOS to meet with the driver of a semi-truck that was supposed to provide the CI with approximately 200 pounds of methamphetamine and 10 kilograms of cocaine. The CI was supposed to provide approximately $400,000 in United States currency to the driver during this meeting. Investigators prepared a box that had a weight consistent with that amount of United States

currency and issued it to the CI prior to the meeting. On March 18, 2023, at the place in Bluefield, West Virginia that the CI and GALLEGOS had arranged for the meeting, investigators observed GONZALEZ arrive driving a semi-truck with California License Plate XP20326 and an attached trailer with Idaho License Plate TF8128. During the meeting, GONZALEZ hand-delivered multiple boxes and a bag to the CI. Following the transaction, investigators took possession of the bag and boxes from the CI and confirmed that they contained controlled substances. The CI handed the box that was supposed to contain money to GONZALEZ, and GONZALEZ placed the box inside the cab of his truck. After the meeting concluded, investigators followed GONZALEZ, initiated a traffic stop on the semi-truck with attached trailer, and arrested GONZALEZ. Investigators later determined that the bag and boxes delivered by GONZALEZ (working on behalf of GALLEGOS) to the CI contained a total of approximately four kilograms of suspected cocaine and 196 pounds of suspected methamphetamine. These suspected controlled substances field tested positive for cocaine and methamphetamine, respectively.

12.   During a post-arrest interview of GONZALEZ, GONZALEZ told investigators that he dropped boxes off to an individual in Bluefield, West Virginia and that he picked up a box of money from that same individual at the direction of another individual in California. GONZALEZ told investigators that he had a second phone for speaking with the individual in California, which he advised he did to protect himself. GONZALEZ told investigators the contact in his phone for the California individual was listed as "Primo". The phone number listed in GONZALEZ's phone under the contact name "Primo" was the same number the CI utilized to speak to GALLEGOS and arrange the meeting in Bluefield, West Virginia on March 18, 2023.

13.     On or about March 20, 2023, GALLEGOS began speaking to the CI utilizing a different telephone number.  Investigators have reviewed multiple recorded calls between GALLEGOS and the CI.  During some of the calls, the CI and GALLEGOS spoke about the traffic stop of GONZALEZ.

14.     On April 4, 2023, the CI conducted a consensual meeting with GALLEGOS in Los Angeles, California.  Following the meeting, GALLEGOS was stopped by officers as he operated a motor vehicle.  GALLEGOS did not stop immediately, and law enforcement pursued him.  Once law enforcement was able to stop GALLEGOS, he was fully identified and arrested for Conspiracy to Distribute Methamphetamine.  GALLEGOS was in the vehicle with his wife, VANESSA SOLIS.  Four of the SUBJECT DEVICES were recovered from the vehicle during the traffic stop.  Based on training and experience, investigators know that suspects often discard evidence or contraband from vehicles during police pursuits. For this reason, after the pursuit had concluded, an officer involved in GALLEGOS' arrest walked the route that was taken by GALLEGOS during the pursuit. The officer walked north on Hill Street in Los Angeles, California, at which time he found two of the SUBJECT DEVICES on the sidewalk.  The officer took digital photographs depicting the location in which the SUBJECT DEVICES were located. The officer examined the phones and saw one was grey with minor scratch marks (which were possibly caused when the phone was discarded). The SUBJECT DEVICES were all collected and retained as evidence.

15.     On April 11, 2023, GALLEGOS was indicted for Conspiracy to Distribute Methamphetamine in violation of 21 U.S.C. § 846 in the United States District Court for the Southern District of West Virginia.

16. Based on my training, experience, the investigation thus far as described herein, probable cause exists that the SUBJECT DEVICES contain evidence of drug trafficking by GALLEGOS and others. Specifically, evidence of drug-related communications by GALLEGOS and his coconspirators and confederates along with photographs or other information more fully described in Attachment B are currently located within the electronic memory of the SUBJECT DEVICES.

## TECHNICAL TERMS

17. Based on my training and experience, I use the following technical terms to convey the following meanings:

    a. Cellular telephone: A cellular telephone (or mobile telephone, or wireless telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also

include global positioning system ("GPS") technology for determining the location of the device.

18. The SUBJECT DEVICES are cellular telephones. In my training and experience, examining data stored on cellular telephones can uncover the relevant evidence described above as well as evidence identifying who used or possessed the device.

19. Some of the SUBJECT DEVICES are Apple products. In my training and experience, examining data stored on these kinds of devices can uncover the relevant cellular telephone evidence described above as well as evidence identifying who used or possessed the device. Apple devices are often linked (or "synched") together such that information like text messages and other kinds of communications, notes, contact lists, documents, and application data will be maintained on all synched devices. For example, Apple devices like iPhones, Apple Watches, and iPads frequently share a single "Apple ID" or "iTunes" account by a user which will allow messages and other information to be maintained or simultaneously transmitted over all devices actively sharing that account. This allows an iPhone user the convenience of also receiving and transmitting his or her iPhone communications over an iWatch and/or an iPad. Similarly, data edited or saved on one synched device may be maintained on the other devices synched to that account or device. Often, synched devices have different security protocols such that they may not all be locked, or one device may be more easily accessed by the examiner. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

20. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. The information would include but not be limited

9

to text messages, multimedia messaging service (MMS) messages, and encrypted messages to and from coconspirators over various applications like SnapChat, Instagram, and Facebook. Phone logs, usernames, GPS locations, and images are also stored on electronic devices. Similarly, things that have been viewed via the Internet are typically stored for some period on the device. This information can sometimes be recovered with forensics tools.

21. Forensic evidence. As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described in the warrant, but also forensic evidence that establishes how the SUBJECT DEVICES were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence is stored within the memory of the SUBJECT DEVICES because:

    a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Forensic evidence on a device can also indicate who has used or controlled the SUBJECT DEVICES. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

    b. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

    c. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process.

        Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether electronically stored information is evidence may depend on other information stored on the device and the application of knowledge about how electronically stored data works. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

    d.  Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

22.    Based on the foregoing, and consistent with Rule 41(e)(2)(B), the applied-for warrant would permit the examination of the SUBJECT DEVICES consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the devices to human inspection in order to determine whether it is evidence described by the warrant.

23.    Because this warrant seeks only permission to examine devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is probable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

24.     I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the SUBJECT DEVICES described in Attachment A to seek the information described in Attachment B.

Respectfully submitted,

*[signature]*

Jennifer L. King
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me by telephone pursuant to Fed. R. Crim. P. 41(d)(3)

On  April 21 , 2023:

*[signature]*

DWANE L. TINSLEY
UNITED STATES MAGISTRATE JUDGE